IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUSSELL A. MERINAR,<br><br>    Plaintiff,<br><br>    v.<br><br>N. GRANNIS, N. DAYALAN, A. ROSENTHAL, J. CLOSE, DR. SINNACO, DR. LUCA and JEANNE WOODFORD,<br><br>    Defendants.<br>_____ | No. C 04-4003 JSW (PR)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND ORDERING DEFENDANTS WOODFORD AND SINNACO TO SHOW CAUSE WHY DEFAULT SHOULD NOT BE ENTERED AGAINST THEM**<br><br>(Docket nos. 22, 39) |

**INTRODUCTION**

Plaintiff Russell A. Merinar filed this *pro se* civil rights action under 42 U.S.C. § 1983 when he was incarcerated at the Correctional Training Facility at Soledad (CTF). Plaintiff recently notified the Court that he resides at a re-entry facility in North Hollywood. In an order dated May 27, 2005, the Court reviewed Plaintiff's second amended complaint and ordered service of Plaintiff's claims of deliberate indifference to his serious medical needs on Defendants Drs. Dayalan, Rosenthal, Close, Luca and Sinnaco, and Department of Corrections Director Woodford and Appeals Coordinator N. Grannis. All Defendants, with the exception of Woodford and Sinnaco, have filed a motion for summary judgment (docket no. 22). Plaintiff has filed an opposition to the motion, and Defendants have filed a reply. Plaintiff also has moved for the entry of a default judgment against Woodford and Sinnaco, who have not filed an answer to the second amended complaint nor otherwise appeared in this matter.

For the reasons discussed below, the Court grants in part and denies in part the motion for summary judgment, and directs Defendants Woodford and Sinnaco to show cause why a default judgment should not be entered against them.

**STATEMENT OF FACTS**

The following statement of facts is based on the declarations and attached exhibits

submitted by the parties in support of and in opposition to the motion for summary judgment. The facts are undisputed unless otherwise noted.

On November 19, 2002, while in the custody of the California Department of Corrections, Plaintiff had surgery for spinal cord injuries caused by a fractured neck. He had two cervical discs[1] replaced and a metal plate and six screws inserted. The surgery was performed by Dr. Remington at Doctors Hospital of Manteca, in Manteca, California.

Approximately two weeks later Plaintiff was paroled on December 7, 2002, to Los Angeles, California.

Plaintiff did not return to see Dr. Remington for follow-up care while on parole because he was no longer near Modesto, where Dr. Remington's office was located. But he alleges that he did make follow-up visits to Los Angeles County Hospital for infection and pain control, and to be scheduled for neurological follow-ups. He alleges that he was seen by a neurologist who ordered that he wear a "hard collar" neck-brace and attend physical therapy sessions.

Plaintiff returned to state custody on April 3, 2003. On June 24, 2003, he was taken into custody at the reception center at North Kern State Prison (NKSP). Upon his arrival he was seen by Dr. Andrew Leong, who prescribed a cervical collar for Plaintiff to be worn for thirty days, and placement in a low bunk because of his medical condition. On June 27, 2003, an x-ray was taken of Plaintiff's cervical spine by Dr. McLennan, who wrote that "Fusion appears complete at the C4-5 levels. An anterior cervical plate is noted with screws in good position. Alignment of the vertebral bodies is satisfactory. Significant disk space narrowing above the fusion or below the fusion is not depicted. Impression: 1) Status post anterior cervical diskectomy and fusion C4-5 and 6, fusion has

---

[1] This word is spelled alternately as "disc" and "disk" throughout this order, based on the preference of the individual being quoted. Where quotes are not at issue, the Court has chosen to use "disc."

1  occurred and alignment is satisfactory.  No significant arthritic change."  Decl. of
2  Michael L. Friedman, M.D., in Support of Defendants' MSJ, Ex. 2.
3    On July 4, 2003, Plaintiff filed a request to be seen by a neurologist or spine
4  specialist.  On July 23, 2003, Plaintiff was seen by Dr. Iway at NKSP who told Plaintiff
5  "You will need a follow-up with neurology after your transfer to your mainline facility,
6  your request for physical therapy can be addressed at that time."  *Id.*, Ex. 4.
7    On August 1, 2003, Plaintiff submitted a request to see a neurologist "as soon as
8  possible due to not being seen after surgery Nov 2002 and due to the fact that I am still
9  wearing a neck brace, am in immediate need of being seen.  Only a neurologist can say
10 what is needed.  *Id.*, Ex. 5.
11   On August 18, 2003, Dr. J. Close, in a second level response from the NKSP
12 medical department, denied Plaintiff's appeal because he had been interviewed by Dr.
13 Iway on July 23, 2003, a referral had not been found necessary until Plaintiff was
14 transferred to his permanent location, and on the same date as the appeal response
15 Plaintiff had been transferred to CTF and the Medical Appeals Coordinator at NKSP had
16 contacted the Medical Appeals Coordinator at CTF and informed her of Plaintiff's
17 medical appeal.
18   On August 18, 2003, Plaintiff was transferred to CTF.
19   On August 25, 2003, Plaintiff was seen by Dr. Dayalan, who wrote that Plaintiff
20 was complaining of neck pain, that he was wearing a cervical collar, and that he was able
21 to turn his head in all directions.
22   On September 16, 2003, the medical records show that Plaintiff complained of
23 neck pain and Dr. Aung wrote that he would refer Plaintiff for further evaluation.
24   On October 5, 2003, Plaintiff submitted an appeal complaining that he still had
25 not been seen by a neurologist and that he was having sharp neck pain that was not being
26 managed.
27
28
                3

On November 4, 2003, Plaintiff was seen by Dr. Grewal, and complained of pain in the back of his neck and the occipital area. The examination found no pain in the upper extremities; a surgical scar on the right side of the neck was noted. In an informal level appeal response dated November 5, 2003, Dr. Grewal wrote that Plaintiff was interviewed and examined that day and medication was prescribed.

On November 18, 2003, Plaintiff submitted a follow-up appeal in which he stated that he was still in "serious pain," and that the prescribed medication was not helping. He stated that it had been one year since his surgery and he had not had a follow-up visit with a neurologist or spinal expert.

On December 15, 2003, Plaintiff wrote a letter to Dr. Remington, who had performed his surgery.

On December 16, 2003, Dr. Sinnaco denied Plaintiff's request to see a neurologist but wrote that "you will be referred to an internist with experience in neurology and pain management." On that same date Plaintiff wrote on the appeal "I am satisfied." *Id.*, Ex. 13. The medical record shows that Dr. Sinnaco also prescribed Gabitril for Plaintiff.

On December 29, 2003, Dr. Remington wrote back to Plaintiff, and said that he would like to see Plaintiff for surgery follow-up. He wrote that he would like Plaintiff "to get AP and Lateral cervical spine x-rays and see me for follow-up." Plt.'s Counter Affidavit, Ex. C. Plaintiff states that he made this letter known to the Defendants at CTF, but they ignored it.

On January 5, 2004, Plaintiff saw Dr. Rosenthal, reporting that he had a sharp ache in his neck, which would gradually go away. He stated that the ache was at the base of his neck and the temporal area, and that he had a similar pain previously, going from the front of his head to the back of his neck. Dr. Rosenthal conducted an examination and found tenderness in the neck at C3-5. Left and right arm mobility were within normal limits. He prescribed Gabitril and Motrin for the neck and head aches.

On March 30, 2004, in a Director's Level Appeal decision, N. Grannis, the Chief of Inmate Appeals in Sacramento, addressed Plaintiff's requests to see a neurologist and for physical therapy, and for transfer to a medical facility. The decision stated that the medical department at CTF had been contacted about Plaintiff's medical treatment and status, and it had been learned that Plaintiff had had three physician visits at CTF regarding his neck concerns, that he had missed a March 16, 2004, appointment, and Plaintiff's January 5, 2004, appointment showed that although his range of motion was somewhat limited in his neck, the medications he was receiving were helpful and had improved his motion. The decision concluded that "Staff at CTF are providing the appellant with reasonable accommodation regarding his neck and previous neck surgery concerns. There is no indication that a neurology appointment is medically necessary for the appellant at this time." Friedman Decl., Ex. 17.

On April 6, 2004, Plaintiff saw Dr. Din for a refill of his pain medication and complained of headache and chronic pain since his surgery and limited range of motion in his neck. Dr. Din wrote that Plaintiff stated that Gabitril was effective but made him nauseous, but he would like to continue with it. The medical record appears to indicate that Dr. Din suggestion a reduction in the amount of Gabitril in order to help control the nausea.

On April 11, 2004, Plaintiff filed an appeal complaining that he still had not seen a neurologist and that he wanted to have his "old medication" prescribed for his pain. On May 3, 2004, Plaintiff was seen by Dr. Rosenthal, complaining that his neck and head aches were getting worse. Dr. Rosenthal told Plaintiff that he must continue to take Gabitril.[2] On May 7, 2004, Dr. Sinnaco responded to Plaintiff's appeal, stating that it was partially granted because he already had been prescribed two kinds of pain

---

[2] According to Defendants, the notes of Plaintiff's examination by Dr. Rosenthal show that Plaintiff told Dr. Rosenthal that although Gabitril helps, he was not taking it regularly as prescribed. The Court has reviewed the medical records and is unable to find this reference.

medication since August 25, 2003, already had been given an x-ray, and already had been examined twice by a competent internist on January 5 and May 3, 2004, i.e., Dr. Rosenthal. On May 11, 2004, Plaintiff appealed to the formal level, stating that he was having serious pain, that he wanted to see a neurologist and not an internist, and that he wanted to be issued his previous medication. On May 18, 2004, Dr. Rosenthal responded to Plaintiff's appeal, advising that Plaintiff not be prescribed the painkiller Neurontin.

On May 27, 2004, Plaintiff saw Dr. Dayalan and requested Neurontin for his pain. He reported taking Gabitril. He wanted a neurology follow-up. His examination revealed no numbness or tingling in his arms. His request was denied.

On June 8, 2004, Plaintiff appealed the denial. He wrote in his request for second level review: "I am having serious neck pains and my finger tipps [sic] have been feeling like needles are poking them." Plt.'s Counter Affidavit, Ex. E. To his appeal he attached Dr. Remington's letter recommending a follow-up examination.

On June 23, 2004, Plaintiff saw Dr. Luca, and again requested Neurontin and referral to a neurologist. According to Dr. Luca's examination, the range of motion on Plaintiff's neck was slightly limited, the range of motion in the arms was normal, there was no indication that the pain resulted from nerve damage, and the June 27, 2003, x-ray showed excellent clinical healing. Dr. Luca denied the request for Neurontin, because there was no pain going down the arms. He found that Gabitril was more than what was needed. He stated his suspicion that some of Plaintiff's complaints of pain were the result of "somatisation," but it is not clear from the medical record to which of Plaintiff's symptoms he is referring. He prescribed Gabitril.

On July 7, 2004, Plaintiff filed a request for a Director's Level Appeal.

On August 30, 2004, Plaintiff saw Dr. Rosenthal, complaining of neck pain and headache, and stating that the Gabitril he had been using for the past eight months did not work as well as the Neurontin. He had no shoulder or arm pain. Examination revealed that he had tenderness in the C5-7 area, with full range of motion. The notes

state that Dr. Rosenthal told Plaintiff about the adverse side effects of some medication, the name of which the Court is unable to decipher, and that Plaintiff stated that he was willing to take Neurontin.

On September 13, 2004. Plaintiff saw Dr. Rosenthal and stated that the Gabitril was helping more to relieve the pain. Dr. Rosenthal renewed the Gabitril prescription.

On October 18, 2004, Plaintiff's appeal requesting a prescription for Neurontin and to see a neurologist was denied at the Director's Level.

On November 12, 2004, Dr. Sinnaco renewed Plaintiff's Gabitril prescription.

On November 17, 2004, Plaintiff saw Dr. Friederichs, requesting increased Gabitril. Examination showed a well-healed neck scar and decreased range of motion in the neck. Plaintiff was prescribed Gabitril for ninety days and neck exercises.

On November 22, 2004, Plaintiff saw Dr. Luca, complaining of pain in his arms and limited range of motion. He stated that "the only thing he wants" is a follow-up with a neurologist, as had been recommended by his surgeon. Plaintiff did not want to be examined, he wanted to see a neurologist and be prescribed Neurontin and Motrin. Dr. Luca indicated that he would recommend that Plaintiff see a neurologist. Defendants state that Plaintiff then threatened Dr. Luca with a lawsuit. Plaintiff states that he told Dr. Luca that by the time he saw a neurologist it would too late because a lawsuit already would have been filed.

On December 14, 2004, this Court issued its first order of service in this action, finding that Plaintiff presented cognizable claims for relief against Defendants Drs. Dayalan, Close and Rosenthal.

On December 23, 2004, the Medical Utilization Committee at CTF approved a neurosurgical consultation for Plaintiff, to take place one to two months afer an MRI was taken. The requesting physician who ordered the MRI, Dr. Luca, circled the word URGENT on the form requesting treatment. Plt.'s Counter Affidavit, Ex. G.

On February 16, 2005, an MRI was taken. The parties dispute the implications of

the MRI. Plaintiff maintains that it shows a protruding disc at C6-7 and degenerative disc disease. Defendants claim that it shows that from C2-C6 "there is no evidence for posterior disk protrusion," and that "At C6 level, right posteromedial disk protrusion measuring approximately 3 mm is noted." *Id.*, Ex. H.

On March 17, 2005, Brittany Glidden of the Prison Law Office sent a letter to Deputy Attorney General Maria Chan, asking what type of follow-up Plaintiff would be receiving after his surgery and the MRI, what plans were being made for his treatment and pain management.

On April 26, 2005, Plaintiff had a neurological examination by Dr. Viravathana, in which it was noted that since soon after his surgery Plaintiff had been experiencing neck pain and headache, off and on, and that during the past year he had experienced numbness in both hands, especially when he woke up in the morning. Dr. Viravathana found that the neurological examination showed "The inmate had positive Tinel's sign[3] on both wrists, and had tenderness on the spinal process of C4 and 5 and tenderness on both cervical paraspinal muscles at the base of the skull and on both sides. All of the cranial nerves are normal and the fundi are benign." The doctor found the status of Plaintiff's "post cervical discectomy and fusion without any sign of the cervical nerve

---

[3]According to the internet encyclopedia, Wikipedia,

> Tinel's sign is a way to detect irritated nerves. It is performed by lightly banging (percussing) over the nerve to elicit a sensation of tingling or "pins and needles" in the distribution of the nerve.

> For example, in a person with carpal tunnel syndrome where the median nerve is compressed at the wrist, Tinel's sign is often "positive" and causes tingling in the thumb, index, and middle fingers. Tinel's sign is sometimes referred to as "distal tingling on percussion" or DTP.

Retrieved from "http://en.wikipedia.org/wiki/Tinel's_sign"

8

root being pinched or cord compression." However, it was noted that Plaintiff "might have bilateral carpal tunnel syndrome because of the Tinel's sign on the median nerve on both wrists." The doctor recommended:

> Regarding both cervical disc surgeries, the inmate should avoid heavy lifting, over 25 pounds with lifting instructions given. Inmate should be treated with Motrin on a PRN basis and a muscle relaxant.
>
> Regarding the headache, it is secondary to the neck strain, or sprain. If the symptoms do not subside with physical therapy, and a nonsteroidal anti-inflammatory medication, the inmate should be seen by the pain clinic at CSP Corcoran fo trigger point therapy.
>
> Inmate should have an NCV and EMG of both upper extremities for diagnosis of the carpal tunnel syndrome.
>
> The inmate is supposed to come back to my clinic after the test.

*Id.*

On April 20, 2005, Plaintiff wrote a letter to Dr. Remington. He enclosed the MRI report and asked Dr. Remington if surgery was needed and if he would be willing to do it. On May 4, 2005, Dr. Remington wrote back to Plaintiff, stating that he would need to do a physical examination and look at the actual MRI films themselves before he could determine whether surgery would be required. He wrote that he would like to make an appointment with Plaintiff and to evaluate the MRI films at that time.

On May 26, 2005, Plaintiff was seen by Dr. Galicia who performed nerve conduction studies on Plaintiff's upper extremities. Dr. Galicia found that the nerve conduction studies of Plaintiff's right upper extremity were normal, but the nerve conduction studies of the left upper extremity were consistent with mild left ulnar nerve entrapment at the elbow. The recommendation was for no prolonged left elbow flexion, no pressure at the left ulnar groove, consideration of the use of non-steroidal anti-inflammatory medications, and if the situation worsened, consideration of surgery.

On May 27, 2005, Plaintiff filed his amended complaint, adding Drs. Luca and Sinnaco, and N. Grannis and Jeanne Woodford as Defendants.

9

On July 8, 2005, a six-month medical hold was issued for Plaintiff at CTF which stated that Plaintiff was "being treated for a medical condition that requires completion of a specialized course of treatment. He should be retained at this institution on MEDICAL HOLD until completion of this treatment." *Id.*, Ex. L.

On July 21, 2005, Plaintiff was seen by a neurosurgeon who diagnosed Plaintiff as having left ulnar nerve entrapment and cervical disc herniation. On a physician's request form that had the word URGENT circled, it was recommended that Plaintiff receive Neurontin for his nerve pain and surgery on his left elbow. *Id.*, Ex. M.

On October 26, 2005, Plaintiff notified the Court that he had been released from prison. He now resides in North Hollywood, in Southern California.

## DISCUSSION

I.   STANDARD OF REVIEW

Summary judgment is properly granted when no genuine and disputed issues of material fact remain and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the Court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. The Court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive

law will identify which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. The burden then shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), *cert. denied*, 502 U.S. 994 (1991). A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 323.

II.     LEGAL CLAIMS

Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. *Id.* at 1059.

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.* (citing *Estelle*, 429 U.S. at 104). The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a serious need for medical treatment. *Id.* at 1059-60 (citing *Wood v. Housewright*, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In order for deliberate indifference to be established, there must be a purposeful act or failure to act on the part of the defendant and resulting harm. *See McGuckin*, 974 F.2d at 1060; *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). A finding that the defendant's activities resulted in "substantial" harm to the prisoner is not necessary, however. Neither a finding that a defendant's actions are egregious nor that they resulted in significant injury to a prisoner is required to establish a violation of the prisoner's federal constitutional rights. *See McGuckin*, 974 F.2d at 1060, 1061 (citing *Hudson v. McMillian*, 503 U.S. 1, 7-10 (1992) (rejecting "significant injury" requirement and noting that Constitution is violated "whether or not significant injury is evident")).

Once the prerequisites are met, it is up to the factfinder to determine whether deliberate indifference was exhibited by the defendant. Such indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown in the way in which prison officials provide medical care. *See id.* at 1062. "A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). Similarly, a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference, *see Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970); however, the reliance by prison officials upon a second medical opinion which a reasonable person would likely determine to be inferior to one from a more qualified medical authority may amount to an Eighth Amendment violation. *See Hamilton v. Endell*, 981 F.2d 1062,

1066-67 (9th Cir. 1992) (prison's reliance upon medical opinion of doctor who had not examined plaintiff as opposed to plaintiff's regular physician violated prisoner's constitutional rights).  In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that they chose this course in conscious disregard of an excessive risk to plaintiff's health.  *See Toguchi*, 391 F.3d at 1058.

A plaintiff need not prove complete failure to treat.  Deliberate indifference may be shown where access to medical staff is meaningless as the staff is not competent and does not render competent care.  *See Lolli v. County of Orange*, 351 F.3d 410, 420-21 (9th Cir. 2003) (holding that a jury could infer that correctional officers' failure to provide medical care in response to detainee's extreme behavior, sickly appearance and statements that he was diabetic and needed food demonstrated deliberate indifference); *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (en banc) (summary judgment should not have been granted to defendants where plaintiff presented evidence that prison officials failed and refused to follow doctor's orders for a liquid diet for plaintiff whose mouth had been wired shut to treat a broken jaw); *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) (summary judgment reversed where medical staff and doctor knew of head injury, disregarded evidence of complications to which they had been specifically alerted and without examination prescribed contraindicated sedatives).

Although prison authorities have "wide discretion" in the medical treatment afforded prisoners, *see Stiltner v. Rhay*, 371 F.2d 420, 421 (9th Cir.), *cert. denied*, 387 U.S. 922 (1967), delay providing surgery in which the delay proved harmful could amount to deliberate indifference, *see Shapely,* 766 F.2d 407, as could a failure to provide treatment because of a tight budget, *see Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986).  In deciding whether there has been deliberate indifference to an inmate's

serious medical needs, the court need not defer to the judgment of prison doctors or administrators. *See Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

III. ANALYSIS

Defendants argue that Plaintiff has not raised a triable issue of material fact regarding whether he suffered from a serious medical need requiring medical consultation with a neurologist. They point to his June 27, 2003, x-ray, which showed that the surgery on his neck had been successful, and note that while Plaintiff "did make complaints of pain in his neck, that pain was treated with pain-relieving drugs." Defs. MSJ at 8. They conclude that "Aside from that pain and some limited range of motion in his neck, there were no other physical problems." *Id.* They then go on to cite to the conclusions reached by the various physicians who examined Plaintiff in 2003 and 2004. They argue that Plaintiff missed "several appointments" and failed to take his medication, and that he stated in writing on December 13, 2003, that he was satisfied to be seen by an internist rather than a neurologist. Finally, they rely on the MRI, which they argue shows that his condition had not worsened since his surgery.

In response, Plaintiff refers to his numerous complaints of pain and his ongoing requests for medication, and disputes Defendants' assessments of the medical implications of the x-ray and MRI results. He states that he missed medical appointments that were not related to his neck pain, and that one of the appointments he missed was because he had the flu, which is documented in the medical records. He states that he wrote that he was "satisfied" to see an internist because that was the only option with which he was provided. To support his claim that he was and continued to suffer, he refers to the recommendations made by the neurologist he finally saw on July 21, 2205, that he be given Neurontin for pain and that he needed surgery.

Defendants argue further that even if Plaintiff did suffer from a serious medical need there is no factual dispute regarding whether they acted with deliberate indifference

14

to that need, because there is no evidence that any of the doctors disregarded an excessive risk to Plaintiff's health by not referring him to a neurologist, or that any of them subjectively believed that by denying Plaintiff's request for a neurological examination they would be subjecting him to a substantial risk of serious harm. They argue that their conclusions are borne out by the neurological examination Plaintiff received on April 26, 2005, which showed that he had suffered no additional injury and no physical deterioration after the November, 2002, surgery.[4]

      In response, Plaintiff refers to evidence which shows that Defendants were aware of his ongoing suffering and that the pain medications he was taking were not effective on a long-term basis, yet they routinely denied his requests for the stronger medicine he had previously taken (Neurontin) not because he did not need it, but because of a Department of Corrections' policy that doctors should not prescribe this medication for inmates because of the potential for abuse. He further argues that the x-ray and MRI films showed signs of disc herniation and degeneration, and that the evidence shows that Defendants refused to send Plaintiff to a neurologist for a second opinion, even though they knew Plaintiff's surgeon had recommended a follow-up visit, and that they acted to refer him to a specialist only when they received notice that Plaintiff had filed this lawsuit.

      The Court finds Plaintiff has presented sufficient evidence to create triable issues of material fact regarding whether his injuries amounted to a serious medical need and, if so, whether Defendants CTF doctors Rosenthal, Dayalan and Luca, and Appeals

---

[4] Defendants note that the neurologist did recommend further tests to determine whether Plaintiff had carpal tunnel syndrome in his wrists, but maintain this was an area of the body Plaintiff had not complained about previously. However, it is disputed whether Plaintiff did previously complain about those symptoms (i.e., the numbness and sensation of "needles" in his hands), and whether the pressure on his ulnar nerve was related in any way to his cervical disc problems.

Coordinator Grannis acted with deliberate indifference to that need. However, the Court finds that Plaintiff has not carried his burden of bringing forth evidence which creates a triable issue regarding whether Defendant Dr. Close, the doctor at NKSP who denied Plaintiff's request to see a specialist because he was being transferred (the same day) to CTF, acted with deliberate indifference. Even when all of the evidence Plaintiff has presented with respect to Defendant Close is viewed as true, Dr. Close's actions do not amount to deliberate indifference as a matter of law.

Accordingly, the motion for summary judgment is DENIED as to Defendants Dayalan, Luca, Rosenthal and Grannis. Summary judgment is GRANTED as to Defendant Close, against whom all claims are accordingly DISMISSED.

IV. PLAINTIFF'S MOTION FOR ENTRY OF DEFAULT

Pursuant to Federal Rule of Civil Procedure 55(b)(2), Plaintiff moves for entry of default against Defendants Woodford and Sinnaco, whom the Court ordered served at the same time as all other Defendants, and whom the United States Marshal served by mail with a summons and complaint, yet are the only Defendants who have not appeared or otherwise communicated with the Court regarding this action. Accordingly, within **twenty (20)** days from the date of this order, Defendants Jeanne Woodford, Director of the California Department of Corrections in Sacramento, and Dr. Sinnaco at CTF, shall SHOW CAUSE why Plaintiff's motion should not be granted. No hearing will be held. Defendants' failure to respond to this order will result in the entry of default against them.

**CONCLUSION**

For the foregoing reasons, the Court orders as follows,

1. Summary judgment is GRANTED as to Defendant Dr. Close. The Clerk of the Court shall terminate him as a Defendant in this action.

2. Summary judgment is DENIED as to Defendants Grannis, Rosenthal, Dayalan

and Luca. In the interests of justice and efficiency, the Court will STAY the scheduling of further proceedings, i.e., reference to a magistrate judge for settlement proceedings and a case management conference, with respect to these Defendants until Defendants Woodford and Sinnaco have responded to the order to show cause. However, if Plaintiff is able to find counsel to represent him in this matter he should notify the Court and Defendants as soon as possible.

    3. Within **twenty (20)** days from the date of this order Defendants Woodford and Sinnaco shall show cause why Plaintiff's motion for entry of default should not be granted.

    4. The Clerk of the Court shall send a copy of this order to Defendant's counsel, to Plaintiff at his most current address, and to Defendant Jeanne Woodford at the Department of Corrections in Sacramento and Defendant Dr. Sinnaco at the Correctional Training Facility in Soledad.

    This order terminates docket numbers 22 and 39.

    IT IS SO ORDERED.

DATED: February 21, 2006

                              JEFFREY S. WHITE
                              United States District Judge